J-S21031-20
J-S21032-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.C.M.C. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.R.C., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 62 WDA 2020 |

Appeal from the Order Entered December 2, 2019
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No. 65 OF 2019

| | | |
|---|---|---|
| IN RE: ADOPTION OF C.C.M.C. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.I.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 63 WDA 2020 |

Appeal from the Order Entered December 2, 2019
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  065 of 2019

BEFORE:  LAZARUS, J., DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                FILED OCTOBER 28, 2020

A.R.C., Jr. ("Father"), and A.B. ("Mother") (collectively "Parents" or "the parents") appeal from the Orders granting the Petitions, filed by the Westmoreland County Children's Bureau ("WCCB" or the "Agency"), seeking to involuntarily terminate their parental rights to their biological child,

C.C.M.C. ("Child"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[1]  We affirm.

In its Opinion pursuant to Pa.R.A.P. 1925(a), the trial court set forth the factual background and procedural history of this appeal as follows:

> [Child] was born [in March 2012] into the custody of her parents....  By June 2012, there had been a referral to the [Agency] (for conditions of housing and hygiene, bedbugs and bites over [Child's] body, cat urine and feces, etc.).
>
> [Child] was adjudicated dependent on October 13, 2017, on the basis that the conditions remained unabated.  ... [T]he descriptions of the conditions, in part, were:
>
> > several general protective service referrals regarding ... housing, [sic] conditions, hygiene, lack of food in the home, bedbugs, fleas, gnats, flies, cat urine and feces on

_____

[1] In an Order entered on September 11, 2019, the trial court appointed Leslie Uncapher, Esquire ("Attorney Uncapher"), to serve as Child's guardian ad litem ("GAL") and legal interests counsel.  At the time of the hearings, Child was seven years and seven months old, but she has special needs, receives physical and speech therapy, and had an Individualized Education Program, as she has developmental and learning delays, and "emotional characteristics."  N.T., 10/17/19, at 11-13, 19-22; see also In re Adoption of L.B.M., 161 A.3d 172 (Pa. 2017) (plurality) (holding that 23 Pa.C.S.A. § 2313(a) requires that counsel be appointed to represent the legal interest of any child involved in a contested involuntary termination proceeding.  The Court defined a child's legal interest as synonymous with his or her preferred outcome); In re T.S., 192 A.3d 1080 (Pa. 2018) (concluding that the trial court did not err in allowing the children's GAL to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome).  We do not comment on the quality of Attorney Uncapher's representation of Child.  See In re: Adoption of K.M.G., 219 A.3d 662, 669 (Pa. Super. 2019) (en banc), appeal granted in part, 221 A.3d 649 (Pa. 2019) (holding that this Court has the authority to raise, sua sponte, only the issue of whether the trial court appointed any counsel for the child, and not the authority to delve into the quality of the representation).

the floor of the home, which caused a strong ammonia smell throughout the home and outside the front door of the home … food encrusted and moldy dishes, pots and pans piled in the sink…[.]

Also, established through the dependency proceeding were findings as to both [P]arents having untreated mental health issues. [Child] was then (by [the] Order of October 13, 2017) removed from [Parents'] custody and placed with her foster parents. This has been the status now for over two years.

[Mother] reported to the caseworker that she suffered from PTSD [Post-Traumatic Stress Disorder], depression and anxiety, and had [previously received] open[-]heart surgery to deal with a heart condition.

[Father] was found having a diagnosis of chronic undifferentiated schizophrenia, depression and anger issues, and habitual alcohol abuse.

The dependency review evidence of April 9, 2018, records that[,] during the review period from October 2017 until April 2018, neither parent had visits with [Child]. Twenty[-]three visits were missed, because, in consideration of hygiene issues, neither parent could receive medical clearance.

By [the] October 2018[] dependency review [hearing,] [Child] was expressing a desire to see [Mother and Father], but to live with her foster parents. Also[,] by that time, the parents were demonstrating substantial compliance with the permanency plan, and moderate progress. [Mother] was in mental health counseling, had a WCSI [Westmoreland Casemanagement and Supports, Inc.,] representative, and was applying for [Supplemental Security Income ("SSI")].

[Father] was receiving SSI/[Social Security Disability ("SSD")], had been recommended for intensive outpatient treatment for drug and alcohol and mental health issues, and was participating in a dual diagnosis program through Merokee [sic]. Among other things, parent-child interactional therapy was offered to both parents.

By the April 10, 2019, dependency review hearing, [Child] expressed her desire to continue living with her foster parents,

but the parents showed progress - Mother, "minimum", [Father], "moderate" [-] according to the findings made at that time.

On June [19], 2019, the [Agency] filed [ ] written [P]etition[s] [seeking the termination of Father's and Mother's parental rights to Child].

As to [Father], the [P]etition alleges that, even after receiving many services, [Father] has been unable to demonstrate an ability to care for [Child], and, in order to do the minimum, required the presence and guidance of others. As to [Mother], [the Petition alleges that Mother's] mental heal[th] rendered her barely able to care for herself, and unable to care for a child.

Trial Court Opinion, 1/24/20, at 1-3 (some internal quotation marks omitted).

On October 17, 2019, the trial court held an evidentiary hearing on the Petitions. At the hearing, the Agency presented the following witnesses: Neil Rosenblum, Ph.D. ("Dr. Rosenblum"); Jonathan Fornal ("Mr. Fornal"); Richelle O'Malley ("Ms. O'Malley"); Kelsey Dolan ("Ms. Dolan"); Melissa Husenits; Megan Schweppe; Alyssa Anderson; and Molly Clayton ("Ms. Clayton"). Mother testified on her own behalf. Father also testified on his own behalf.

On December 2, 2019, the trial court entered Orders granting the Petitions and involuntarily terminating the parental rights of Father and Mother to Child, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).

On December 9, 2020, and December 30, 2020, Father and Mother, respectively, timely filed their Notices of Appeal, along with Concise

Statements of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[2]

Father raises one issue:

Did the [t]rial [c]ourt err in terminating Father's parental rights due to Father's inability to parent the Child, when the Agency continued to schedule joint visits with the Mother and the Father[,] even though it became clear that Mother's presence inhibited Father's progress?

Father's Brief at 4.

Father claims that the trial court improperly concluded that Father had demonstrated an inability to perform parental duties, "when he was never afforded the opportunity to engage in services independent of Mother." Id. at 9. Father contends that he put forth a "good-faith intent and effort[,] and likely was hindered to an extent by his limited cognitive abilities." Id. (internal quotation marks omitted). Father concedes that "concerns remained for Father's ability to care for himself and [ ] Child at the time of termination." Id. Father argues, however, that the testimony of his providers at the termination hearing showed that "Mother served as a major impediment to Father's progress." Id. According to Father, the actions of Mother's relatives brought his own housing into question. Id. Father claims that, because of Mother's behavior during the parents' visits with Child, there was never a full

_____

[2] We have listed the appeals of both parents consecutively and disposed of all issues in one Memorandum, as did the trial court, for ease of disposition.

evaluation of his own, independent, parenting ability. Id. Father asserts that, despite the Agency's knowledge that Mother was causing him a problem with the visits, the Agency never afforded him independent visits, and never provided him an opportunity to show he was capable of managing a residence and providing basic necessities for Child, independent of Mother. Id. at 9. Father urges that, absent these opportunities, the Agency could not demonstrate that he was unable or unwilling to perform parental duties for Child. Id.

Father argues that he

put forth the best effort that he could to the best of his ability. In re Burns, 379 A.2d [535,] 541 [(Pa. 1977)]. The lack of progress that he made in his independent parenting ability was not the result of Father's inability or ambivalence, but was a result of the manner in which visits were being provided to Father. The Agency, through its providers, recognized this problem, but did nothing to address the concern.

Accordingly, it is averred that any lack of progress on the part of the Father was due to this breakdown in the services provided to Father. As such, it cannot be shown that Father was unable to overcome his parenting deficits if afforded the opportunity for independent interaction with the Child. See 23 Pa.C.S.[A.] § 2511(a)(1) [sic] (requiring a showing of "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.")[].

Father's Brief at 9-11.

Mother raises the following issue for our review:

Whether the trial court erred in finding by clear and convincing evidence that the [Agency] met its burden, under 23 Pa.C.S.[A.] §[ ]2511(b)[,] when the interactional evaluation expert opined that it would be in the best interest of [Child] to maintain periodic contact and visitation with her Parents?

Mother's Brief at 4.[3]

Mother argues as follows:

In the case at bar, Dr. Rosenblum stated [ ] Child was comfortable greeting her Parents and was pleased to see her Mother. Overall, [ ] Child was comfortable with her Parents during the interactional evaluation.

Dr. Rosenblum noted that it would be in the best interest of [ ] Child to maintain periodic contact and visitation with her Parents.

Ms. O'Malley's observations of Mother and [ ] Child establish the Mother's affection and love for [ ] Child. As important was Ms. O'Malley's observation that [ ] Child was willing to receive Mother's affection and even sought it out.

Additionally, [ ] Child resided with Mother from birth, March of 2012, until October of 2017[,] when the [Agency] took custody. Mother cared [sic] and had custody of [ ] Child for over five years.

An inference can be drawn that a bond exists between Mother and Child that if terminated would not best serve the developmental, physical[,] and emotional needs and welfare of the child.

This is supported by the testimony of Dr. Rosenblum that it would be in the best interest of [ ] Child to maintain periodic contact and visitation with her Parents.

Thus, the [Agency] has not met its burden with regard to [section] 2511(b)[,] and Mother's parental rights should not be terminated.

Mother's Brief at 11-12.

_____

[3] Mother stated her issue somewhat differently in her Concise Statement, but we find it sufficiently preserved for review.

Mother apparently concedes that the Agency satisfied its burden with regard to section 2511(a), and challenges the sufficiency of the evidence as to only section 2511(b). Mother argues that, while she had care and custody of Child from the time of Child's birth in March 2012, until the removal of Child from Mother's care and custody in October 2017, Child developed a bond with Mother. Id. at 9. Mother contends that the Agency failed to satisfy its burden with regard to section 2511(b), because there continues to be a bond between Mother and Child, and severance of that bond would not best serve the developmental, physical and emotional needs and welfare of Child. Id.

In reviewing an appeal from a decree terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. In re: R.J.T., ... 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. Id.; [In re] R.I.S., 36 A.3d [567,] 572 [(Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Id.; see also Samuel Bassett v. Kia Motors America, Inc., ... 34 A.3d 1, 51 (Pa. 2011); Christianson v. Ely, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. Id.
>
> As we discussed in R.J.T., there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold

record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. R.J.T., 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. In re Adoption of Atencio, 650 A.2d 1064, 1066 (Pa. 1994).

In re Adoption of S.P., 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." Id. This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), along with consideration of 2511(b). See In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). Section 2511(a)(2) and (b) provides as follows:

§ 2511. Grounds for involuntary termination

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

- 9 -

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. See In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may

include acts of refusal as well as incapacity to perform parental duties. In re A.L.D. 797 A.2d 326, 337 (Pa. Super. 2002).

In its Opinion accompanying the termination Orders, the trial court stated as follows:

The birth parents first came to the attention of the [WCCB] in 2014. A case file was opened[,] and services provided for a period of about 15 months, and then services were closed.

By September 2016, there was a second referral, and[,] in June 2017, a third.

The various witnesses describe a history in which substantial services and assistance have been provided, but, ultimately, with very little success. Both [P]arents have lived with chronic mental health and emotional issues that have led to abominable housing and living conditions, [and] failed attempts at childcare and child communications.

Over these years, this challenged seven-year-old [C]hild has found normalization and security in her foster home, and now has anxiety and nervousness in her parents' custody.

Today, the parents do not possess the ability to meet [Child's] developmental needs, even though each [P]arent is well[-]intended and would wish to be able to do so and have their daughter returned to them.

The extensive testimony from a variety of professionals convinces [the trial court] that the continuing inability and incapacity of [Parents] have caused [Child] to be without essential care, and that, despite repeated efforts by [Parents], cannot be provided by either parent.

* * *

Moreover, after substantially more than six months, one can find no reasonable basis to believe there is any substantial change in the situation and conditions which led to [Child's] removal, and the evidence offers little hope that anything can change or that conditions which prevailed can be remedied.

> All of the predicate conditions required by 23 Pa.C.S.A.
> § 2511(a)(2) … and (b) have been proven by clear and convincing
> evidence as to each parent.

Trial Court Opinion, 12/2/19, at 1-2. In its supplemental Opinion, the trial

court further expounded that Parents have

> demonstrated a chronic incapacity to care for and raise this seven-
> year-old-child.
>
> ….
>
> The testimony at the trial was essentially that various
> providers and caseworkers offered and provided services, but,
> despite all-out efforts, were unable to obtain success. In the final
> analysis, the parents are unable to adequately care for [Child].
> Even so, [Child] can survive and thrive through the care of the
> foster parents, whom she now views as "primary".
>
> The testimony (and report) of [Dr. Rosenblum], clearly
> captures the essence of this matter. Page 15 of his report
> [states]:
>
> > [At this] time it does not appear as if either parent has
> > been able to adequately address their mental health or
> > adjustment concerns which led their daughter, [Child], into
> > care in the first place. Neither parent displays the
> > independence in their personal functioning that would be
> > needed to function effectively and maintain a healthy,
> > productive lifestyle, let alone provide suitable care and
> > reliable attention to the emotional developmental needs of
> > their daughter.
> >
> > [Child] additionally has special needs, and is a child who
> > requires a very high level of care and attention. As such[,]
> > this evaluator does believe that a goal change to adoption
> > is consistent with [Child's] needs and welfare at this time.
> > I would recommend a referral for adoption mediation. It
> > is my understanding that foster mother, [K.M.], will be
> > amenable to [Child] having some continued contact with
> > her birth parents under appropriate circumstances and
> > supervision. I do believe that it would be in [Child's] best

- 12 -

> interest to be able to maintain periodic contact and visitation with her birth parents. At the same time, it is my clinical opinion that only through a goal of adoption will [Child] be afforded an opportunity to remain in a stable and secure family environment that is capable of reliably meeting her needs at this time and in the years to come.
>
> Neil D. Rosenblum, Ph.D., Licensed Clinical Psychologist
>
> CONCLUSIONS
>
> Evidence supporting the termination of parental rights is clear and convincing. Not only did the parents initially demonstrate a history of neglect, but[,] even after extensive services, have not demonstrated the ability to provide the [C]hild with essential care. Moreover, the psychological assessments are detailed and clear in concluding that neither parent has the capacity to provide the level of care needed for this [C]hild's physical and mental wellbeing. The requirements of [] 23 Pa.C.S.[A.] § 2511(a)(2) … have been reviewed. [Child] has made remarkable advancements in the custody of the foster parents, and termination and adoption will best serve the needs and welfare of [Child].

Trial Court Opinion, 1/24/20, at 1, 3-4.

Thus, based on the testimony of the providers, caseworkers, and Dr. Rosenblum, the trial court found that the termination of Father's and Mother's parental rights to Child is warranted pursuant to subsection 2511(a)(2), as Father and Mother clearly lack parental capacity, and the evidence showed that they will be unable to remedy that situation within a reasonable period of time, if ever. See id. Recognizing that Mother did not challenge termination pursuant to section 2511(a)(2), the record nonetheless supports the trial court's findings and conclusions, as to both Mother and Father. In particular, we note the following evidence, presented at the hearing.

At the time of the hearing, Child had been in care for twenty-two months. N.T., 10/17/19, at 170. Ms. Clayton, an Agency supervisor, testified that Child's family had an open case with the Agency for fifteen months, beginning on May 28, 2014, because of concerns regarding housing conditions, underuse of community resources, and the parents' mental health. Id. at 169. On August 17, 2015, the Agency closed the case because Mr. Fornal was able to improve their housing by getting them a new home, and was able to set Child up with Head Start. Id. Nine months later, on May 16, 2016, the Agency received another referral raising the same concerns of mental health and housing conditions, and services were put in place. Id. at 169-70. The Agency closed the second case on February 10, 2017. Id. at 170. Four months later, the Agency received the current referral on June 12, 2017. Id. at 170.

Ms. Clayton stated that Parents parented Child better with the services provided than they parented on their own. Id. at 170. Ms. Clayton testified that the same concerns were always present in the Parents' supervised visits with Child: Parents' lack of structuring; Parents' failure to bring food and snacks for Child; Parents' issues interacting with Child's homework; and Mother's negativity toward Father. Id. at 176-77. The Agency had both Mother and Father visit together to lessen the emotional trauma on Child, because the visits were traumatic for Child, and because Parents had been a "couple," so one visit would be less stressful on Child than two separate

visits. Id. at 177. Moreover, no one had made a request for separate visits. Id.

Ms. Clayton testified that Mother and Father are making arrangements for different housing, but she would not consider their housing to be stable. Id. at 177-78. Father completed his court-ordered drug and alcohol evaluation and his court-ordered mental health evaluation at SPHS on April 17, 2018. Id. at 178-79. The testimony reflects that Father had successfully completed drug and alcohol treatment on March 29, 2019. Id. at 179. Father attends some Alcoholics Anonymous meetings, and was not ordered to do drug screens. Id. Father attended mental health treatment at SPHS until mid-August 2018. Id. Father then was accepted into dual diagnosis treatment, where his treatment is ongoing. Id. Father has attended visits with Child along with Mother, except when Mother was ill. Id. at 180. Father allowed Mother to take the lead at visits until April 2019, when he began to engage more with Child, and became better able to pick up on her social cues and offer her comfort. Id. at 180-81. Father has not consistently provided Child with food, and has issues in assisting Child with her homework. Id. at 181. Father has SSI income, but does not manage his own money. Id. Father was court-ordered to complete anger management classes, and he did so at JusticeWorks on December 6, 2018. Id.

The Agency provided transportation to visits for both parents through ProjectStar, but they were not able to utilize them. Id. at 181-82. Ms.

Clayton is unaware of any services that the Agency could have provided, but did not provide, which would have assisted reunification between Child and the parents. Id. at 183. Ms. Clayton has seen improvements in the parents' abilities to parent Child, but not any improvements that would be sustained without direct assistance from a provider. Id. at 184. She opined that Parents will not be able to remedy the reasons for which Child was removed from their home (deplorable housing conditions and lack of food), and sustain it, in the future. Id. at 185. She has observed the same cycle of problems over the five years prior to the hearing with no sustainable change, so she could not approximate when they would be able to remedy the situation. Id. at 186.

Ms. Clayton further opined that termination would best serve Child's developmental, physical, and emotional needs and welfare. Id. at 187-88. Ms. Clayton explained that Child does not need to worry about her basic needs being met in her foster home, and that she seeks out her foster parents for comfort. Id. at 188. Child's foster parents are helping her to improve socially and academically. Id. at 188-89. Ms. Clayton testified that the Agency is not recommending termination because of environmental factors beyond the parents' control. Id. at 189.

At the time of the hearing, Child had been in her pre-adoptive foster home since April 2018, for approximately sixteen months. Id. at 170. Ms. Clayton had observed Child in her foster home, where she is making progress.

Id. Child states that it is her home, and she is excited to show the caseworkers her room, her work, and her "sisters." Id. Ms. Clayton testified that Child becomes dysregulated following visits with Parents. Id. at 189-91. Ms. Clayton testified that the pre-adoptive foster parents are open to a referral for a post-adoption contact agreement under the Post-Adoption Contact Agreement Act, 23 Pa.C.S.A. § 2731 et seq. N.T., 10/17/19, at 191-92.

Also, at the hearing, Dr. Rosenblum testified as to his evaluations of the interactions of Child with her foster mother (K.M.), Mother, and Father. Dr. Rosenblum performed an interactional evaluation with Child and her foster mother, K.M., as well as interactional evaluations between Child and Mother and Father, and individual evaluations of Child, Mother and Father. Id. at 6-7. Dr. Rosenblum testified that, while Parents had explanations for their difficulties, they were continuing to struggle with their individual adjustments and lifestyle issues, and were not able to provide a safe, stable, and secure home for Child. Id. at 41. The following exchange occurred between counsel for the Agency and Dr. Rosenblum, by which he provided his expert opinion within a reasonable degree of scientific certainty:

> Q. [The Agency:] What are your recommendations and conclusions in this case?
>
> A. [Dr. Rosenblum:] My conclusions are that [P]arents both present with very chronic mental health and adaptive living problems that significantly impact and interfere with their ability to function effectively as adults, and clearly would interfere with their ability to provide a stable, secure home for their daughter and provide consistent, appropriate attention to her emotional and developmental needs. I believe that the delays that [Child] has

- 17 -

experienced and the impact on her emotional security at the time of the removal have been clearly documented. [Child] is now in a safe, stable, and secure home environment that has an outstanding track record of responding to her needs effectively.

It is my recommendation to the [c]ourt that it consider a goal change to adoption that, in my opinion, is consistent with [Child's] needs and welfare.

Q. Would you have concerns, if the child were to live with her biological [P]arents, that they could provide her with the basic necessities of life?

A. I believe there is documentation that [Parents were unsuccessful in providing Child with the basic necessities of life]. I believe, based on their continued difficulties with their personal adjustment and lifestyle issues, that there's no reason to believe that they're capable of meeting her needs now.

Q. If parental rights were terminated, would the [c]ourt be terminating a necessary and beneficial relationship for [Child]?

A. No. I always recommend consideration of contact and visitation, but I cannot say that this is a relationship that is necessary or beneficial to [Child] at this time. Clearly, this is a child who is clinging to the security and stability that she experienced in her foster home. Her developmental well-being will be reassured and confirmed by her continued presence in this [foster] home, which is what I would recommend as an adoptive outcome.

N.T., 10/17/19, at 41-43. The trial court admitted Dr. Rosenblum's Report and Recommendations, dated May 15, 2019, as Agency Exhibit 2. Id. at 43.

Further, the trial court found Father's arguments concerning his ability to care for Child, in light of his level of intelligence and difficulties, and the need for additional time to develop his parenting skills with the provision of additional services, such as separate visits, unpersuasive. Although Father relies on In re Burns, that case does not support his argument. In that case,

our Supreme Court affirmed the termination of the mother's parental rights, rejecting her argument that her health, financial and emotional problems justified her failure to make any effort to perform her parental duties. In re Burns, 379 A.2d at 541.

Moreover, with regard to section 2511(a)(2), our Supreme Court has rejected the argument that the provision of reasonable efforts by the county children's services agency is a factor in termination of the parental rights of a parent to a child. See In the Interest of: D.C.D., a Minor, 105 A.3d 662, 672-74, 676 (Pa. 2014) (rejecting the suggestion that an agency must provide reasonable efforts to enable a parent to reunify with a child prior to the termination of parental rights, and further rejecting the suggestion that section 2511(a)(2) of the Adoption Act should be read in conjunction with section 6351 of the Juvenile Act, particularly section 6351(f)(9)(iii)). Thus, based on our Supreme Court's holding in In the Interest of: D.C.D., a Minor, Father's argument that the Agency should have made reasonable efforts to allow him to demonstrate his ability to parent Child, exclusive of Mother, lacks merit.

Thus, we discern no abuse of the trial court's discretion in concluding that Father's and Mother's parental rights should be terminated under section 2511(a)(2). In re Adoption of S.P., 47 A.3d at 826-27.

Next, we address section 2511(b). We have explained that the focus in terminating parental rights under section 2511(a) is on the parent, but it is

on the child pursuant to section 2511(b).  In re Adoption of C.L.G., 956 A.2d 999, 1008 (Pa. Super 2008) (en banc).  In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated the following:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child."  23 Pa.C.S.[A.] § 2511(b).  The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability."  In re K.M., 53 A.3d 781, 791 (Pa. Super. 2012).  In In re E.M., [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child.  The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.  In re K.M., 53 A.3d at 791.

In re: T.S.M., 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, the court is not required to use expert testimony.  Social workers and caseworkers can offer evaluations as well.  Additionally, section 2511(b) does not require a formal bonding evaluation.  In re Z.P., 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted).  Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances … where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child."  In re K.Z.S., 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

- 20 -

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent …. Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in [and] of itself, or when considered in connection with a child's feeling toward a parent, to establish a de facto beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

In re K.K.R.-S., 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. See In re K.Z.S., 946 A.2d at 763-64 (affirming the involuntary termination of the mother's parental rights, despite the existence of some bond, where placement with the mother would be contrary to the child's best interests, and any bond with the mother would be fairly attenuated when the child was separated from her, almost constantly, for four years).

Our Supreme Court has observed that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." See In re: T.S.M., 71 A.3d at 267 (quoting In re K.K.R.-S., 958 A.2d at 535). The Supreme Court instructed, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the

- 21 -

children cannot be misconstrued as bonding." In re: T.S.M., 71 A.3d at 267 (quoting In re Involuntary Termination of C.W.S.M., 839 A.2d 410, 418 (Pa. Super. 2003) (Tamilia, J. dissenting)).

This Court has explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. In re Z.P., 994 A.2d at 1121. Further, this Court has stated: "[A] parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." In re B.,N.M., 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." In re Adoption of C.L.G., 956 A.2d at 1007 (citing In re Z.S.W., 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

In this matter, the trial court found that Child had suffered from years of neglect by her parents, and it adopted the clinical opinion of Dr. Rosenblum that "only through a goal of adoption will [Child] be afforded an opportunity to remain in a stable and secure family environment that is capable of reliably meeting her needs at this time and in the years to come." Trial Court Opinion, 1/24/20, at 3-4. The competent evidence in the record supports the trial

court's conclusion that "termination and adoption will best serve the needs and welfare of the child." Id.; see also In re: T.S.M., 71 A.3d at 267. Accordingly, we affirm the Orders of the trial court.

Orders affirmed.

Judge Lazarus joins the memorandum.

Judge Dubow concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/28/2020